IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Faith Crabbe,                              :
                    Petitioner             :
                                           :   No.  455 C.D. 2016
            v.                             :
                                           :   Argued:  December 6, 2017
Unemployment Compensation                  :
Board of Review,                           :
                    Respondent             :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY
JUDGE McCULLOUGH                           FILED:  February 28, 2018


        Faith Crabbe (Claimant) petitions for review from the February 24, 2016 order of the Unemployment Compensation Board of Review (Board) affirming the decision of a referee which denied her unemployment compensation benefits under section 402(e) of Pennsylvania's Unemployment Compensation Law (Law).[1]

---

[1] Section 402(e) of the Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §802(e).  Section 402(e) provides that "an employe shall be ineligible for compensation for any week . . . [i]n which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work, irrespective of whether or not such work is 'employment' as defined in this act."  43 P.S. §802(e).

**Statutory Background**

The General Assembly amended portions of the Child Protective Services Law (CPS Law)[2] several times in 2014 and 2015. Relevant here, before 2014, the CPS Law required background checks for new employees who would be working with children. This background check requirement did not apply to long-time existing employees, like Claimant. *See former* Section 6344(k) of the Child Protective Services Law, 23 Pa.C.S. §6344(k). However, Act 153 of 2014,[3] effective December 31, 2014, eliminated the exception for long-time existing employees. *See id.*, Historical and Statutory Notes, Act 2014-153 legislation (among other changes, deleting subsection (k)).

Act 153 of 2014 added a new provision, section 6344.4, 23 Pa.C.S. §6344.4 to the CPS Law. Among other things, this new provision required recertification for existing child care employees. In pertinent part, the new section 6344.4 allowed an employee 36 months from the date of his existing certification to obtain the recertification now required by Act 153 of 2014; however, if his certification was older than 36 months, the employee needed to obtain recertification within one year of the effective date of the new section. *See former* Child Protective Services Law, 23 Pa.C.S. §6344.4(1)(iii), Historical and Statutory Notes, Act 2015-15 legislation. Because Act 153 of 2014 was generally effective December 31, 2014, a child care employee with an existing certification older than 36 months would have until December 31, 2015, to comply. Based on Claimant's testimony that she held a

---

[2] 23 Pa.C.S. §§6301-6386.

[3] Act of October 22, 2014, P.L. 2529, No. 153.

certification from "many years before," this deadline would have applied to Claimant. (Certified Record (C.R.) at Item No. 10; Notes of Testimony (N.T.), 11/3/15, at 53.)

The General Assembly amended Act 153 of 2014 with Act 15 of 2015, generally effective July 1, 2015.[4] In part, Act 15 of 2015 clarified some of the recertification requirements of the new section 6344.4. Relevant here, section 6344.4(1)(iii) now provides: "Any person identified in Section 6344 with a current certification issued prior to the effective date of this section [December 31, 2014] shall be required to obtain the certifications required by this chapter within 60 months of the date of the person's oldest certification or, if the current certification is older than 60 months, within one year of the effective date of this section." 23 Pa.C.S. §6344.4(1)(iii). Thus, the July 1, 2015 amendment did not disturb Claimant's December 31, 2015 deadline.

**Facts and Procedural History**

Claimant was employed with Greater Norristown Police Athletic League (Employer) as a facility manager from August 1, 2004, to August 18, 2015. She was terminated for continuing to ignore guidelines of her employment, which included insubordination and failure to obtain all child care background clearances within the specific time period provided by Employer. Claimant filed an application for unemployment compensation benefits. (C.R. at Item No. 13; Referee's Finding of Fact (F.F.) No. 27.) The local service center denied Claimant benefits under section 402(e) of the Law. Claimant appealed and a referee held a hearing at which Claimant, who was represented by counsel, and Kenneth Fennal, Employer's director of operations,

_____

[4] Act of July 1, 2015, P.L. 94, No. 15.

3

testified. Ultimately, the referee determined that Claimant was ineligible under section 402(e) of the Law and affirmed the service center's denial of benefits.

Employer is a non-profit, volunteer organization serving youth and families in the community with recreational, educational, and cultural programs. Act 153 of 2014, effective December 31, 2014, imposed new requirements on certain employees and volunteers to obtain state and federal criminal background checks and child abuse clearances. The clearances included (1) a Pennsylvania State Police Criminal Background Check; (2) a Department of Human Services Child Abuse Clearance; and (3) a FBI Criminal Background Check with fingerprinting (collectively, clearances). (C.R. at Item No. 13; Referee's op.; F.F. Nos. 2-3.)

Claimant alleged she sustained a back injury while at work on May 7, 2015.[5] Claimant sent an email to several other employees advising she would be out of work until May 25, 2015. Mr. Fennal responded by requesting that Claimant provide a doctor's note before her return and reminding her that all further communications relating to her employment status should remain private and should be directed only to her immediate supervisor. On May 25, 2015, Claimant returned to work with no limitations or restrictions. (C.R. at Item No. 13; F.F. Nos. 4-8.)

As noted above, the legislature enacted Act 15 of 2015, effective July 1, 2015, which amended Act 153 of 2014. Act 15 included a new deadline of August 25,

---

[5] On May 13, 2015, Employer held a staff meeting. (C.R. at Item No. 4, Exhibit 10.) The meeting minutes indicate that the new clearance requirements for all employees, "effective, July 1st" were discussed. *Id.* While Claimant's name does not appear in the list of those in attendance, (*id.*), Claimant did acknowledge in her testimony that she knew of the clearance requirement in May, (C.R. at Item No. 10, N.T., 11/3/15, at 64).

4

2015, for prospective adult volunteers, who had never previously volunteered, to obtain the required clearances.[6]

On May 27, 2015, Mr. Fennal emailed several employees, including Claimant, with an explanation of how the employees could obtain their clearances and included a link. On June 1, 2015, Mr. Fennal emailed Claimant, reminding her that she had not provided information or documentation regarding her alleged May 7, 2015 work injury. Thereafter, Claimant alleged that she sustained a second back injury and Employer placed her on light duty. Claimant returned to full duty on June 27, 2015. (C.R. at Item No. 13; F.F. Nos. 9-11, 14.)

In the meantime, on June 15, 2015, Mr. Fennal emailed several employees, including Claimant, with a summary of proposed changes to the CPS Law. On June 22, 2015, Mr. Fennal again sent an email to several employees, including Claimant, stating that all employees were expected to provide the required clearances by June 29, 2015, so that the clearances would be "in place" by July, 1, 2015.[7] (C.R.

---

[6] In one of the findings of fact, the referee stated that, under Act 15, "[a]ll other compliance deadlines remain[ed] the same." (C.R. at Item No. 13; F.F. No. 13.) This was a misstatement in that Act 153 of 2014, which allowed those with existing certifications 36 months to obtain the new clearances, was amended by Act 15 of 2015 to permit those existing certifications issued prior to December 31, 2014, 60 months to obtain the new clearances, unless the certification was older than 60 months, in which case the employee would have until December 31, 2015. However, as discussed further below, this finding was, at most, tangential to the referee's reasoning for finding that Claimant was dismissed for willful misconduct.

[7] While the specific date that Claimant first learned of the deadline for these clearances is unclear, during the hearing, under questioning by Claimant's present counsel of record, Claimant was asked:

> [Claimant's counsel:] Now were you aware that the law was being changed as of July 1 which required everyone to apply for these clearances?

5

at Item No. 4, Exhibit 15.) As of July 1, 2015, Claimant had not provided Employer with the necessary clearances. On July 8, 2015, Mr. Fennal sent an email reminding employees, including Claimant, that the clearances were "NEEDED FROM ALL." (C.R. at Item No. 4, Exhibit 16.) On July 20, 2015, Mr. Fennal sent Claimant an email stating that he had not yet received her clearances or her applications for them, with the exception of the FBI fingerprint request. (C.R. at Item No. 13; F.F. Nos. 12, 15-17.)

On July 23, 2015, Mr. Fennal sent all employees a memo with information regarding the required clearances and reminded them that the deadline for submitting clearances was July 1, 2015. The memo also stated that Employer's Employee Compliance Committee determined that any employee who had not yet submitted clearances and/or proof of applications to Mr. Fennal would have 48 hours to do so. The policy was to take effect upon receipt of the memo, which was sent by email and in person, the verification of which was to be done by "read receipt." (C.R. at Item No. 13; F.F. No. 19.) The memo warned that failure to comply would subject an employee

---

[Claimant:] Yes.

[Claimant's counsel:] Okay. When did you come to know that?

[Claimant:] We had a staff meeting.

. . .

[Claimant's counsel:] And when was that held?

[Claimant:] That was in May or June. June.

(C.R. at Item No. 10; N.T., 11/3/15, at 53-54.) On cross-examination, Claimant conceded that she learned of the clearance requirement in May 2015. (*Id.* at 64.)

6

to disciplinary action, including termination. Claimant received Mr. Fennal's July 23, 2015 memo. (C.R. at Item No. 13; F.F. Nos. 18-20.)

On July 24, 2015, Mr. Fennal notified all employees of his plan of action. Anyone without "some kind of 'paper trail'" of clearances would not be able to enter the building the following Monday. (C.R. at Item No. 13; F.F. No. 21.) "Paper trail" meant either an email indicating that the employees had applied for clearances or had the printed/mailed clearance paperwork. *Id.*

On the following Monday, Mr. Fennal escorted Claimant from the building because she had not submitted all clearances to Employer "as required under the [CPS] Law." (C.R. at Item No. 13; F.F. No. 22.) Claimant obtained one of the clearances in July 2015, and one in early to mid-August 2015; however, the referee noted that she did not obtain the Pennsylvania State Police Criminal Background Check.[8] On August 18, 2015, Mr. Fennal presented Claimant with a letter of termination. The referee found that Claimant was discharged for "continuing to ignore the guidelines of her employment, including but not limited to the State of PA Clearances requirements, which elevated to the level of insubordination on multiple occasions." (C.R. at Item No. 13; F.F. No. 27.)

In his reasoning, the referee noted that Claimant was given information and instructions regarding applying for the clearances in May of 2015, and was notified about the legal necessity of the clearances. The referee observed that Claimant had well over two months to take the proper steps to retain her position and employment with Employer. Finally, the referee stated that Claimant had not offered any reasonable explanation as to why she could not obtain the clearances "as required under the [CPS] Law within the reasonable amount of time provided by the [E]mployer." (C.R. at Item

[8] Claimant maintains that she had applied for and was in the process of obtaining the third clearance from the Pennsylvania State Police when she was terminated. (Claimant's brief at 8.)

No. 13; Referee's op.) Thus, the referee concluded that Claimant's actions amounted to willful misconduct and affirmed the service center's determination denying Claimant benefits.

Claimant appealed to the Board, which affirmed. The Board adopted and incorporated the referee's findings and conclusions in their entirety. From this decision, Claimant now petitions for review to this Court.

## Discussion

On appeal,[9] Claimant argues that the Board erred by denying her benefits because it applied the wrong burden of proof to substantiate a finding of willful misconduct. Claimant asserts that, although she "tried to the best of her ability to obtain the necessary clearances in a timely manner," her failure to do so was not a deliberate and willful disregard of the interests of the employer that elevated her conduct to willful misconduct. (Claimant's brief at 9). Claimant also argues that her "minimal understanding of the re-certification requirements," and lack of computer skills and ongoing home access to the internet meant that she "could not possibly have committed willful misconduct by failing to obtain the necessary clearances in a timely manner." (Claimant's brief at 10.) Additionally, Claimant asserts that Employer did not give her accurate legal deadlines, sufficient instructions, or timely notification as to how to obtain the clearances in order to keep her position.

---

[9] Our review is limited to determining whether necessary findings of fact were supported by substantial evidence, whether errors of law were committed, or whether constitutional rights were violated. *Hessou v. Unemployment Compensation Board of Review*, 942 A.2d 194, 198 (Pa. Cmwlth. 2008). Findings of fact made by the Board, which are not specifically challenged, are conclusive upon review. *Campbell v. Unemployment Compensation Board of Review*, 694 A.2d 1167, 1169 (Pa. Cmwlth. 1997).

8

The Board responds that, regardless of the fact that the statutory deadline for current employees, such as Claimant, to comply with certification requirements was December 31, 2015, both parties understood Employer's deadline to be July 1, 2015, and further, Claimant waived the issue by raising it for the first time on appeal. We agree.

As the Board notes, a review of Claimant's petition for appeal to the Board reveals that this issue was not raised. *See* C.R. at Item No. 12. "On appeal from a final order of an administrative agency, a reviewing court may address only those issues which were raised in exceptions to the agency." *Gateway School District v. Department of Education,* 634 A.2d 738, 741 (Pa. Cmwlth. 1989). *See also* Pa.R.A.P. 1551(a).[10] Not having been alerted to the question of rule reasonableness by Claimant's petition, the Board did not address it. The failure of Claimant to raise the issue with the Board impairs our ability to review the Board's decision with respect to that issue.

---

[10] The rule provides:

No question shall be heard or considered by the court which was not raised before the government unit except:

(1) Questions involving the validity of a statute.

(2) Questions involving the jurisdiction of the government unit over the subject matter of the adjudication.

(3) Questions which the court is satisfied that the petitioner could not by the exercise of due diligence have raised before the government unit. If, upon hearing before the court, the court is satisfied that any such additional question within the scope of this paragraph should be so raised, it shall remand the record to the government unit for further consideration of the additional question.

Pa.R.A.P. 1551(a).

Consequently, the issue was waived.[11] *See Chapman v. Unemployment Compensation Board of Review*, 20 A.3d 603, 611 (Pa. Cmwlth. 2011) (A claimant waived an issue by failing to raise it before the referee or the Board); *Reading Nursing Center v. Unemployment Compensation Board of Review*, 663 A.3d 270, 275 (Pa. Cmwlth. 1995) (same); *Tri State Scientific v. Unemployment Compensation Board of Review*, 589 A.2d 305, 307 (Pa. Cmwlth. 1991) (same).

---

[11] We note that the entirety of the Dissent's analysis is devoted to addressing this argument, which constitutes a mere two sentences of Claimant's entire 12-page brief. A review of the record reveals that the heart of Claimant's appeal from the outset was based upon an assertion that, because she did not clearly understand the process necessary to obtain the clearances, lived in a low-income area of Norristown, PA, had a hostile supervisor, lacked computer skills and ongoing home access to the internet, and believed (without any evidence) that other employees were in a similar inchoate status, her behavior should not be classified as willful misconduct. *See* C.R. at Item No. 2; C.R. at Item No. 7 at 2A; C.R. at Item No. 12. Notably, the issue of the legal compliance deadline was only raised by Claimant *for the first time* in her petition for review, in which she focuses on the July versus August dates where she states, "The Employer, [UC] Referee and the UCBR misstated the recertification deadlines **required for existing employees** that were outlined in the Child Protective Services Law Act and required by the 2015 amendments to same." (Petition for Review at ¶4) (emphasis in original). It is only in her brief to this Court that Claimant for the first time specifically references the December 31, 2015 compliance date. (Claimant's brief at 7-8.)

In taking the position that the issue was not waived, the Dissent asserts that the following quote from Claimant's appeal from the local service center's determination should have somehow prompted Employer, who was not represented by counsel, to sua sponte explain why its rule deviated from the statutory deadline, despite not being asked as much by Claimant's counsel during the hearing: "It should be further noted that [Claimant] was not only a volunteer but a long term employee of [Employer]." (C.R. at Item No. 7 at 2A.) The Majority fails to see how such a statement sufficiently raised the issue of whether Employer could choose the July deadline such that it should have put Employer on notice to come prepared to the hearing to address the matter. Further, if Claimant were indeed raising the issue in the above quote, it is inexplicable why Claimant's counsel did not then address it during his questioning of Mr. Fennal in the hearing that followed.

Contrary to the Dissent, the Majority does not misperceive the procedural posture in which the issue of the inaccuracy of the referee's Finding of Fact No. 13 (relating to the deadlines of Act 15) was purportedly raised. Claimant did not raise any issue concerning this finding or the deadlines in her appeal to the Board.

Furthermore, even if the issue were not waived, Claimant's argument would fail, as Employer's alleged mistaken reading of the CPS Law and the referee's inclusion of a finding regarding compliance deadlines for new volunteers, which was inapplicable to Claimant, had no impact upon the referee's conclusion that Claimant's actions amounted to willful misconduct. Essentially, Claimant argues that because, in retrospect, she has identified that Employer's rule regarding the July 1, 2015 deadline was, in her opinion, based upon an erroneous reading of Act 15, an error which the referee did not realize, Claimant's choice not to comply with the Employer's rule was excusable because the rule was unreasonable.

Willful misconduct is defined as (1) wanton and willful disregard of an employer's interests; (2) deliberate violation of an employer's rules; (3) disregard of the standards of behavior that an employer can rightfully expect from an employee; or, (4) negligence showing an intentional disregard of the employer's interest or the employee's duties and obligations. *Grieb v. Unemployment Compensation Board of Review*, 827 A.2d 422, 425 (Pa. 2003). If an employer alleges misconduct because of a claimant's violation of a work rule, the employer must prove the existence of the rule and its violation, and the court will determine whether the claimant's violation constituted willful misconduct. *Caterpillar, Inc. v. Unemployment Compensation Board of Review*, 703 A.2d 452, 456 (Pa. 1997). "[W]e examine whether 'the rule or policy is reasonable in light of all the circumstances, and if so, whether the employee [had] good cause to violate the rule or policy.'" *Id.* (quoting *Spirnak v. Unemployment Compensation Board of Review*, 557 A.2d 451, 453 (Pa. 1989)). The reasonableness of an employer's rule is determined based upon whether its application of the rule under the circumstances was "fair, just, and appropriate to pursue a legitimate interest." *Caterpillar, Inc.*, 703 A.2d at 456-57.

11

Here, there can be no doubt that Employer, an organization that serves children, had a legitimate interest in requiring its employees to obtain criminal background checks in an effort to protect those children. Our legislature confirms the existence of that very interest in protecting children with the enactment of Act 153 of 2014 and Act 15 of 2015, which mandate the acquisition of the clearances.

Further, Employer gave Claimant two months to comply with the directive to obtain these clearances and Claimant was reminded of her need to submit them no less than six times. (C.R. at Item No. 4, Exhibits 11, 13, 15-16; C.R. Item No. 10, Exhibits 8-9.) The Board, as fact-finder in this case, adopted the findings of the referee, who determined that Employer allowed Claimant "a reasonable amount of time" to obtain the criminal background clearances. (C.R. at Item No. 13; Referee's op.) A reasonable person could certainly conclude that such a time frame was "fair, just, and appropriate to pursue a legitimate interest"— a fact which is not undermined simply because it was not as lax as would have been legally permissible under Act 153 of 2014. *Caterpillar*, 703 A.2d at 457.

The referee found:

12. On June 15, 2015, Mr. Fenn[al] sent an e-mail to the [C]laimant and several other employees, which included a summary of proposed change[s] to the PA Child Protective Services Law to become effective July 1, 2015.

. . .

15. The [C]laimant had not provided the [E]mployer with the necessary clearances as of July 1, 2015.

16. On July 20, 2015, Mr. Fenn[al] sent an e-mail to the [C]laimant.

17.  The e-mail reminded the [C]laimant the [E]mployer has not received her clearances or application of items, except FBI Fingerprint request.

18.  On July 23, 2015, Mr. Fenn[al] provided all employees with information of required clearances.

19.  Mr. Fenn[al] reminded all employees the deadline for submitting clearances was July 1, 2015 via e-mail, staff meeting, and in-person.  The Employee Compliance Committee had determined any employee that has not yet submitted their clearances and/or proof of applications will have 48 hours to do so.  This will take effect, as of receipt of this employee memo, via e-mail and in-person.  Verification will be received by "read receipt."  Failure to comply will subject an employee to disciplinary action, not limited to and including termination.

20.  The [C]laimant received Mr. Fenn[al]'s e-mail sent on July 23, 2015.

21.  On Friday, July 24, 2015, Mr. Fenn[al] notified all employees of his plan of action after talking to several Board Members.  Anyone without some kind of "paper trail" of the clearances will not be able to come into the building on Monday.  "Paper trail" means an e-mail indicating that they have actually applied for "clearances" and/or has the actually printed/mailed clearance paperwork.

22. On July 27, 2015, Mr. Fenn[al] escorted the [C]laimant out of the building because she did not have all clearances submitted to the [E]mployer as required under the Law.

23. The [C]laimant obtained a Child Abuse Clearance near the end of July of 2015.

24. The [C]laimant obtained an FBI Criminal Background Check in early-to-mid August of 2015.

25. The [C]laimant has not obtained a Pennsylvania State Police Criminal Background Check.

26. On August 18, 2015, Mr. Fenn[al] presented the [C]laimant with a letter of termination.

27. The [C]laimant was discharged for continuing to ignore guidelines of her employment, including but not limited to the State of PA Clearances requirements, which elevated to the level of insubordination on multiple occasions.

(C.R. at Item No. 13; F.F. Nos. 1, 5, 12, 15-27.)

Furthermore, with regard to the specific date that Employer chose as the deadline for compliance, it is clear from the record that both Claimant and Employer were operating under the July 1, 2015 deadline for all employees to obtain the required clearances. Moreover, Claimant did not raise the issue of the statutorily-permissible December 31, 2015 deadline—as opposed to Employer's imposed deadline of July 1, 2015—as the basis for her non-compliance with Employer's rule; nor did Claimant raise her inability to comply with the deadline, seek help attaining the clearances, or ask for an extension.[12] Claimant simply chose not to comply without reasonable explanation. (C.R. at Item No. 13; Referee's op.)

Consequently, there is substantial evidence supporting the findings necessary for the Board to conclude that Claimant was discharged for willful

---

[12] During argument, counsel for Claimant suggested that Claimant was unable to obtain the third clearance because her only means of doing so was through use of Employer's work computers, as she lacked ongoing home internet access, and that, once Claimant was disallowed from entering Employer's building, she lacked the means by which to obtain the third clearance. This argument, however, is belied by the fact that Claimant was made aware that she had not submitted all three clearances on July 23 and was warned that she would have 48 hours to do so. Claimant had the ability to obtain the clearances at work during those subsequent 48 hours but again took no action and, as a result, was understandably no longer permitted to enter the building. Furthermore, we note that Claimant was able to access the internet from outside the workplace while on leave, which was demonstrated by her email correspondence with Employer regarding her alleged back injury. (C.R. at Item No. 10, Exhibits 4-5, 7.)

14

misconduct. As such, the Board correctly determined that Claimant was ineligible for benefits pursuant to section 402(e) of the Law.[13]

---

[13] We note that the entirety of the Dissent's analysis is premised upon the hypothetical notion that Employer inadvertently chose as its compliance date the date that the law took effect (July 1, 2015) instead of adopting the December 31, 2015 statutory compliance date for existing employees, which was the date by which Employers, under penalty of law, had to ensure all such employees were compliant. *See* 23 Pa.C.S. §6349(c) (allowing civil penalties up to $2,500 for noncompliance with child care personnel regulations). The Dissent acknowledges that Employer's reasoning in choosing the July 1, 2015 date is unknown (presumably because the issue was not raised during the hearing) stating, "Employer failed to explain why its new rule was reasonable in light of the deviation from the predicate statutory requirements." (Dissent, slip. op. at 2.)

Furthermore, despite the Dissent's recognition of "an employer's prerogative to impose rules which are more stringent than those set by the General Assembly," (Dissent, slip. op. at 7), taken to its logical conclusion, the Dissent's theory would prohibit employers from doing just that unless, apparently, the employer is able to explain its rationale in such a way that the Dissent would consider sufficient to "interfere with an employee's receipt of UC benefits." (*Id*.) Moreover, despite the Dissent's insistence that Employer was required to explain why its "new rule was crafted to deviate from predicate statutory requirements," (*id.*), the Dissent has not provided any authority which would require as much.

With regard to the issue of why Claimant's application for the third clearance did not satisfy Employer's rule, the Dissent quotes from Claimant's appeal from the determination of the local service center: "Claimant had previously been told that as long as she documented her continuing efforts to get the certification, she would not be terminated. [Employer] terminated her despite this promise." (*Id.*) However, Claimant's alleged receipt of the third clearance by the date of her termination was an assertion made solely by Claimant and, consequently, because it is not a fact of record, its adoption by the Dissent constitutes fact-finding. As to why Claimant's *application* for the third clearance on Monday, July 27, 2015, did not satisfy the requirement that employees submit their clearances and/or proof of applications within 48 hours or risk termination, the Dissent fails to note that the memo giving that instruction was sent on Thursday, July 23, 2015. (C.R. at Item No. 13; F.F. Nos. 18-19.) As such, Claimant's alleged attempt to apply for the third clearance *four days later* was plainly not within the 48 hours the memo allowed. *See supra* note 12. Any discussion of alleged "promises" made by Employer are simply irrelevant as they are, again, not facts of record.

Finally, to the extent that the Dissent suggests the Referee's inclusion of those portions of Act 15 which were inapplicable to Claimant was a "patent misstatement of the law" requiring reversal, (Dissent, slip op. at 3), even if the Dissent were correct that Employer and the referee misunderstood the re-certification requirements of the CPS Law, it is clear that striking the offending portions of that

15

Accordingly, we affirm the order of the Board.

_____
PATRICIA A. McCULLOUGH, Judge

finding of fact would not disturb the referee's reasoning underlying his conclusion that Claimant's conduct amounted to willful misconduct. Instead, the referee emphasized that Claimant had over two months to take the necessary steps to complete the paperwork for the clearances, had still not obtained all clearances by the time of her termination, and had not provided any reasonable explanation for her failure to do so. Although Claimant now makes an argument in passing regarding the reasonableness of the specific compliance date Employer chose, at no point has Claimant suggested that the fact that Act 15 permitted her additional time to obtain clearances was the basis upon which she refused to comply with Employer's rule. Once again, Claimant cannot rely upon a since-discovered error as a retroactive justification for her prior continual decision to willfully ignore Employer's work rule.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Faith Crabbe,                              :
                      Petitioner           :
                                           :      No. 455 C.D. 2016
            v.                             :
                                           :
Unemployment Compensation                  :
Board of Review,                           :
                      Respondent           :


## *__ORDER__*


AND NOW, this 28th day of February, 2018, the February 24, 2016 order of the Unemployment Compensation Board of Review is hereby affirmed.


_____
PATRICIA A. McCULLOUGH, Judge

Faith Crabbe,                          :
                    Petitioner        :
                                       :
          v.                           :    No. 455 C.D. 2016
                                       :    Argued: December 6, 2017
Unemployment Compensation              :
Board of Review,                       :
                    Respondent         :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge


**DISSENTING OPINION**
**BY JUDGE SIMPSON**                    **FILED: February 28, 2018**


        Because the Unemployment Compensation (UC) authorities committed an acknowledged error of law and mistake of fact, I respectfully dissent.


        This case involves termination of a long-term employee for violation of a new employer rule predicated on new statutory requirements.  Here, neither the employer, the Greater Norristown Police Athletic League (Employer), nor the UC authorities understood all the new statutory requirements, which in pertinent part required those with employment that brings them in contact with children to obtain re-certification (clearances) by a specified date under the Child Protective Services Law (CPS Law).[1]

_____
[1] 23 Pa. C.S. §§6301-6386.

Unfortunately, Employer's new rule did not conform to the predicate new statutory requirements as to onset of statutory duties. In particular, amendments to the CPS Law required Faith Crabbe's (Claimant) re-certification by December 31; however, Employer's new rule required re-certification by July 1. Neither Employer, which bore the initial burden of proof, nor the UC authorities, addressed this legal problem. In particular, Employer did not attempt to explain why a July 1 compliance date was needed when the statute did not require Claimant's compliance until December 31. July 1 was the effective date of the relevant amendment to the CPS Law. Claimant was removed from the Employer's building on July 27, and officially terminated on August 18.

I would hold that in a willful misconduct case, the failure of the employer to explain why its new rule deviates from the predicate statutory requirements is fatal to its attempts to defeat unemployment compensation for the terminated employee. Stated differently, I would reverse the denial of unemployment benefits because Employer failed to explain why its new rule was reasonable in light of the deviation from the predicate statutory requirements.

The Majority acknowledges the UC authorities' misstatement of law. Maj. Slip Op. at 5 n. 6. The Majority also acknowledges the UC authorities' "inclusion of a finding regarding compliance deadlines for new volunteers, which was inapplicable to Claimant …." Maj. Slip Op., at 10-11. The Majority dismisses these faults because Claimant failed to timely raise them, and because the faults "had no impact upon the referee's conclusion that Claimant's actions amounted to willful misconduct." Id. I disagree with both these positions.

First, as to waiver, information regarding the re-certification timelines of the amendments to the CPS Law was submitted by *Employer* as part of its Separation Information. See Certified Record (C.R.), Item #4 at 12. This information was identified and admitted during the hearing before the referee. E.g., Referee's Hr'g, 11/3/15, Notes of Testimony (N.T.), at 6.

Also, the referee relied on this submission in part, and he made specific findings based on its content. See Referee's Dec., 12/1/15, Findings of Fact (F.F.) Nos. 3, 13. In particular, the referee found as follows:

> 13. Pennsylvania legislature created Act 15 to become effective July 1, 2015. Act 15 amended the [CPS] Law to clarify changes made to Act 153 of 2014. The Act included a new deadline date for prospective adult <u>volunteers</u>, who have never volunteered before, to obtain the required clearances by August 25, 2015. <u>All other compliance deadlines remain the same</u>. Volunteers are required to obtain the clearances if they provide care, supervision, guidance or control and have routine interaction with children.

F.F. No. 13 (emphasis added).

As discussed below, and as acknowledged by the Majority, the emphasized portion of Finding of Fact No. 13 is a misstatement of the law. Further, the referee did not focus on the parts of the amendments to the CPS Law which related to Claimant; instead, the referee addressed a deadline for certification of new volunteers, rather than re-certifications for existing employees. Obviously, neither Employer nor the referee understood the predicate re-certification requirements of the CPS Law.

RES - 3

Because evidence about the re-certification dates was received by the referee, and because the evidence was actually utilized by the referee, and later the Board, to make findings of fact, albeit incorrectly, I cannot conclude that this issue was waived. Rather, the issue was raised by Employer at the hearing.

Additionally, Claimant's counsel raised the referee's erroneous Finding of Fact 13 in the appeal to the Board.[2] Counsel wrote: "It should be further noted that [Claimant] was not only a volunteer but a long term employee of [Employer]." C.R., Item #7 at 2A. For reasons that are unclear, the Board did not address this significant factual error on appeal.

The Majority claims without explanation that the absence of discussion by the Board (which adopted the referee's findings and conclusions without supplementation) somehow impairs its review for errors of law. Inconsistently, the Majority then devotes several pages to its extensive discussion of the issue. Under these circumstances, the Majority's unexplained claim of impairment is not persuasive. Certainly, I suffered from no impairment to my ability to discern and evaluate errors of law.

More broadly, I cannot hold Claimant to a higher level of understanding of the new statutory requirements than Employer (whose misinformation she was

---

[2] Much of the Majority's discussion in a long note 11 is premised on the mistaken belief that Claimant raised this challenge in an appeal from the local service center's determination to the referee, prior to the hearing. This is incorrect. Claimant's counsel raised the issue of the inaccuracy of Finding of Fact 13 after the referee's hearing, in her appeal to the Board. Because the Majority misperceives the procedural posture in which Claimant's counsel raised the issue, some of the Majority's discussion makes little sense in the context of this case.

following) and the UC authorities.  This is especially true in a willful misconduct proceeding, where Claimant bears no initial burden of proof, and has no ability to explain why Employer crafted its new rule as it did. Only Employer has control of rule-design rationale.

Second, as to determinations that Claimant was guilty of willful misconduct, Employer's new rule required existing employees to obtain re-certification, or at least "proof of applications[,]" by July 1.  <u>See</u> F.F. Nos. 19 (Director reminded employees that deadline for submitting clearances was July 1), 21 (referencing "proof of applications" and "some kind of 'paper trail'").

At the time of termination, Claimant had two of the three clearances required.  Further, she had paperwork establishing that she applied for the third clearance.  In fact, she applied with the help of her supervisor.  Claimant physically received the last clearance after she was terminated.  Br. of Pet'r at 8; N.T. at 54-63.  However, there were no findings by the UC authorities, and hence no fact-based discussion by the Majority, as to why Claimant's "paper trail" or "proof of applications" did not satisfy Employer's new rule.  To the contrary, the UC authorities, after noting Employer's "paper trail" rule as of Friday, July 24, F.F. No. 21, found that Claimant was escorted from the building on Monday, July 27, "because she did not have all the <u>clearances</u> submitted to the employer as required under the Law."  F.F. No. 22 (emphasis added).[3]  The UC authorities made no findings whatsoever as to the dates of Claimant's applications or her "paper trail."

---

[3] Contrary to the assertion of the Majority, the UC authorities made no finding that Claimant did not apply for the last clearance until Monday, July 27, and the Majority does not quote any in its opinion.

This "proof of applications" question was specifically raised in Claimant's appeal to the Board, but the Board never answered it. C.R., Item #7 at 2A ("Claimant had previously been told that as long as she documented her continuing efforts to get the certification, she would not be terminated. [Employer] terminated her despite this promise."). This unexplained gap in factual findings, together with the referee's erroneous legal statement as to the statutory compliance date for Claimant, cause real concern whether the UC authorities' misunderstanding of the predicate statutory requirements clouded their judgment as to conduct amounting to willful misconduct.

As to whether the Employer's new rule was reasonable, we examine whether a rule or policy is reasonable in light of all the circumstances. Caterpillar, Inc. v. Unemployment Comp. Bd. of Review, 703 A.2d 452, 456-57 (Pa. 1997). However, there is no indication that the circumstance of the statutory December 31 compliance date was considered at all by either Employer or the UC authorities. Further, there is no indication that the reason for Employer's deviation from the predicate statutory requirements was considered at all by the UC authorities. Therefore, in these two particulars, the UC authorities did not consider all the important circumstances.

The statutory requirement for the onset of new duties was a policy matter of concern to the General Assembly, and not a technical quibble. Thus, after eight-and-a-half months, the General Assembly amended Act 153 of 2014[4] with Act

_____

[4] Act of October 22, 2014, P.L. 2529, No. 153, effective December 31, 2014.

15 of 2015.[5] In part, the 2015 Act clarified some of the new re-certification requirements of the 2014 Act. Relevant here, through Section 6344.4(1)(iii) of the 2015 Act, 23 Pa. C.S. §6344.4(1)(iii), the General Assembly sought to <u>extend</u>, not reduce, the time for re-certification, while retaining a December 31, 2015 re-certification date for older existing certifications (extending certain periods of re-certification from 36 months to 60 months); <u>see</u> C.R., Item #4 at 12 (titled "Bill Summary," "[Act 15 of 2015] more clearly defines who is subject to the requirements and makes those less onerous in some instances."). Employer's new rule not only deviated from the new statutory requirements, it actually moved in the opposite direction from what the General Assembly was trying to accomplish in making compliance less onerous in some instances.

I recognize an employer's prerogative to impose rules which are more stringent than those set by the General Assembly. I also recognize that an employer may terminate an employee who does not comply with its rules. It is a different question, however, whether an employer can interfere with a terminated employee's receipt of UC benefits without first explaining why its new rule was crafted to deviate from predicate statutory requirements. This should not be burdensome, as almost any logical explanation could suffice. But, Employer did not even meet this low threshold.

---

[5] Act of July 1, 2015, P.L. 94, No. 15, generally effective July 1, 2015.

Because not all the circumstances regarding the new Employer rule were considered, I cannot conclude the non-compliant rule was reasonable. Accordingly, I would reverse.

_____
ROBERT SIMPSON, Judge

President Judge Leavitt joins in this dissent.